## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JAMES FARMER, ROBIN ALESSI, PATSY SCHULTZ, KAREN COLEMAN, TONY COLEMAN, JOHNSON COUNTY, TEXAS, MAINE ORGANIC FARMERS AND GARDENERS ASSOCIATION, and POTOMAC RIVERKEEPER, INC., d/b/a POTOMAC RIVERKEEPER NETWORK | Civil Action No. 24-cv-01654-DLF<br><br>Hon. Dabney L. Friedrich |

       Plaintiffs,

  v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY, and MICHAEL
REGAN, in his official capacity as
Administrator of the United States,

       Defendants,

  and

NATIONAL ASSOCIATION OF CLEAN
WATER AGENCIES,

       Proposed Intervenor-Defendant.

---

## PROPOSED INTERVENOR-DEFENDANT NACWA'S
## MEMORANDUM IN SUPPORT OF MOTION TO INTERVENE

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................. 1

STATEMENT OF FACTS ................................................................................... 8

ARGUMENT ...................................................................................................... 13

  I.   NACWA MAY INTERVENE AS OF RIGHT IN THIS LITIGATION ........................... 13

    A.   This Motion is Timely ................................................................... 14

    B.   NACWA Has a Substantial Interest in this Litigation ................. 15

    C.   The Disposition of this Litigation May Impair or Impede NACWA's Ability to Protect its Interests ............................................ 17

    D.   EPA Cannot Adequately Represent NACWA's Interest ............. 20

  II.  ALTERNATIVELY, THE COURT SHOULD GRANT NACWA PERMISSIVE INTERVENTION ........................................................................... 21

  III.  NACWA IS NOT REQUIRED TO DEMONSTRATE ARTICLE III STANDING, BUT IF REQUIRED, CAN DEMONSTRATE REPRESENTATIONAL STANDING ... 22

CONCLUSION ................................................................................................... 23

# TABLE OF AUTHORITIES

**Cases**                                                                     **Page(s)**

*Am. Horse Prot. Ass'n v. Veneman,*
  200 F.R.D. 153 (D.D.C. 2001) ................................................................. 21

*Ass'n of O&C Counties. v. Trump,*
  No. CV 17-280, 2018 WL 11241964 (D.D.C. Jan. 22, 2018) ................................. 22

*Black v. LaHood,*
  No. CV 11-1928 (JEB), 2012 WL 13054502 (D.D.C. Apr. 30, 2012) ....................... 22

*Crossroads Grassroots Pol'y Strategies v. Fed. Election Comm'n,*
  788 F.3d 312 (D.C. Cir. 2015) ........................................................... 13, 20

*Ctr. for Biological Diversity v. U.S. Dep't of the Interior,*
  640 F. Supp. 3d 59 (D.D.C. 2022) ........................................................... 17

*Dimond v. District of Columbia,*
  792 F.2d 179 (D.C. Cir. 1986) ............................................................... 20

*District of Columbia v. Potomac Elec. Power Co.,*
  826 F. Supp. 2d 227 (D.D.C. 2011) .......................................................... 18

*Env't Def. Fund v. Thomas,*
  No. CV 85-1747, 1985 WL 6050 (D.D.C. Oct. 12, 1985) .................................... 16

*EEOC. v. Nat'l Children's Ctr., Inc.,*
  146 F.3d 1042, 1045–46 (D.C. Cir. 1998) .................................................. 21

*Env't Integrity Project v. Wheeler,*
  No. 20-cv-1734 (KBJ), 2021 WL 6844257 (D.D.C. Jan. 27, 2021) ......................... 22

* *Fowler v. U.S. EPA.,*
  No. CV 09-005 CKK, 2009 WL 8634683 (D.D.C. Sept. 29, 2009) ......................... 21

*Fund Democracy, LLC v. SEC.,*
  278 F.3d 21 (D.C. Cir. 2002) ............................................................... 22

* *Fund for Animals, Inc. v. Norton,*
  322 F.3d 728 (D.C. Cir. 2003) ........................................................ passim

*Hardin v. Jackson,*
  600 F. Supp. 2d 13 (D.D.C. 2009) .......................................................... 21

*Karsner v. Lothian*,
532 F.3d 876 (D.C. Cir. 2008) ........................................................................ 15

*Kleissler v. U.S. Forest Serv.*,
157 F.3d 964 (3d Cir. 1998) ........................................................................... 17

*Nat'l Children's Ctr., Inc.*,
146 F.3d 1042 (D.C. Cir. 1998) ...................................................................... 21

*Nat'l Parks Conservation Ass'n v. U.S. E.P.A.*,
759 F.3d 969 (8th Cir. 2014) .......................................................................... 17

*Nuesse v. Camp*,
385 F.2d 694 (D.C. Cir. 1967) ........................................................................ 21

*Roane v. Leonhart*,
741 F.3d 147 (D.C. Cir. 2014) ........................................................................ 13

*Town of Chester v. Laroe Estates, Inc.*,
581 U.S. 433 (2017) ........................................................................................ 22

*Trbovich v. United Mine Workers*,
404 U.S. 528 (1972) ........................................................................................ 20

*Va. House of Delegates v. Bethune-Hill*,
139 S. Ct. 1945 (2019) .................................................................................... 22

*W. Org. of Res. Councils v. Jewell*,
No. CV 14-1993 (RBW), 2015 WL 13711094 (D.D.C. July 15, 2015) .................. 16

* *Waterkeeper All., Inc. v. Wheeler*,
330 F.R.D. 1 (D.D.C. 2018) ............................................................. 14, 16, 17

*Wildearth Guardians v. Salazar*,
272 F.R.D. 4  (D.D.C. 2010) ........................................................................... 15

**Statutes**

33 U.S.C. § 1345(d) ..................................................................................... 3, 10
33 U.S.C. § 1345(d)(1) ...................................................................................... 12
33 U.S.C. § 1345(d)(2)(A) ................................................................................. 10
33 U.S.C. § 1345(d)(2)(B) ................................................................................. 11
33 U.S.C. § 1345(d)(2)(C) .............................................................................. 3, 11
42 U.S.C. § 7429 ............................................................................................... 10

## Regulations

40 C.F.R. Part 60 Subpart O ................................................................. 10
40 C.F.R. Part 60 Subpart LLLL ......................................................... 10
40 C.F.R. Part 60 Subpart MMMM ...................................................... 10
40 C.F.R. Part 62 Subpart LLL............................................................. 10
40 C.F.R. Part 258.................................................................................. 9
40 C.F.R. Part 503.......................................................... 2, 3, 8, 10, 11

*Request for Nominations to the Scientific Advisory Board Biosolids Chemical
Risk Assessment Panel,*
86 Fed. Reg. 49,021 (Sept. 1, 2021) ...................................................... 6

*Standards for the Use or Disposal of Sewage Sludge,*
58 Fed. Reg. 9,248 (Feb. 19, 1993) ..................................................... 11

## Rules

Fed. R. Civ. P. 1 ................................................................................. 24
Fed. R. Civ. P. 24(a) ....................................................................... 1, 13
Fed. R. Civ. P. 24(b) ....................................................................... 1, 13
Fed. R. Civ. P. 24(a)(2)............................................................ 7, 17, 23
Fed. R. Civ. P. 24(b)(1)....................................................................... 23
Fed. R. Civ. P. 24(b)(1)(B) ................................................................ 8, 9
Fed. R. Civ. P. 24(b)(3)....................................................................... 21

## Other Authorities

6 Moore's Federal Practice - Civil § 24.20 ......................................... 23

EPA, *Basic Information about Biosolids* (Dec. 15, 2023) ..................... 5, 8

EPA, *Approach to Biosolids Chemical Risk Assessment and Biosolids Tool,* ............................... 6

EPA, *Study of PFAS Influent to POTWs* (Mar. 19, 2024) ......................... 7

EPA, *PFAS Strategic Roadmap:*
*EPA's Commitments to Action* 2021–2024 (2021) ................................. 12

EPA, *Biosolids Technology Fact Sheet Use of Incineration for
Biosolids Management* (June 2003)...................................................... 17

EPA, *Municipal Solid Waste Landfills Economic Impact Analysis for the
Proposed New Subpart to the New Source Performance Standards* (June 2014) ...................... 9

*L.D. 1911, An Act to Prohibit the Contamination of Clean Soils with So-called Forever
Chemicals* (Apr. 1, 2022)...................................................................... 18

Massachusetts Department of Environmental Protection,
   *2022 Solid Waste Data Update* (Nov. 2023) ............................................................. 9

NACWA, Biosolids and PFAS: Maintaining Management Options 4 (June 2022) ..................... 9

The National Association of Clean Water Agencies ("NACWA") submits this Memorandum in support of its Motion to Intervene as a Defendant in this action pursuant to Federal Rules of Civil Procedure 24(a) and (b).  Counsel for NACWA contacted all counsel of record.  Defendant consents to NACWA's intervention and Plaintiffs take no position at this time. *See* Local Civ. R. 7(m).  NACWA is a national non-profit trade association representing the interests of over 350 public clean water agencies managing wastewater and stormwater across the country, an essential public infrastructure function that touches every American.  NACWA is intervening on behalf of its members whose critical role of protecting public health and the environment would be undermined by the relief sought by Plaintiffs.  NACWA supports the Motion to Dismiss filed by Defendant U.S. Environmental Protection Agency ("EPA") because Plaintiffs have not demonstrated that EPA has a non-discretionary duty to act or that there is a "final" agency action subject to judicial review.

**INTRODUCTION**

One of the earliest truths we learn in life is central to this case: everybody poops.  The U.S. Environmental Protection Agency ("EPA") and state regulators apply stringent standards to the management of that reality to ensure it is protective of human health and the environment.  These standards are primarily implemented by local public clean water agencies, over 350 of which are NACWA members.  Critically, those standards must account for multiple – and at times, competing – interests, including, among others, scientific and technical feasibility, environmental tradeoffs posed by various wastewater and residuals treatment and management options, affordability, and other environmental justice considerations.  NACWA members are on the front lines ensuring that our sanitary systems support healthy, thriving communities, and as such, they do and should play an active role in informing regulatory decisionmakers on these important issues.

The thousands of chemicals commonly referred to as per- and polyfluoroalkyl substances ("PFAS") pose unprecedented challenges for NACWA's members and other public health professionals. PFAS are ubiquitous in the environment as they are used in countless industrial and commercial processes and thousands of everyday consumer products including cookware, cosmetics, laundry detergent, clothing, food packaging, and contact lenses. PFAS are also used in vital medical products such as pacemakers, as well as in products used to achieve clean energy goals such as lithium-ion batteries for electric vehicles and solar panels. Importantly, the durable chemical bonds that enable these chemicals to be waterproof, greaseproof and heat resistant also result in the inability of the treatment processes used by publicly owned treatment works ("POTWs") to treat hundreds of millions of gallons of wastewater a day to eliminate them.

POTWs have to collect and receive all wastewater from homes, businesses, and institutions, which often include trace amounts of PFAS from washing, rinsing, and flushing. Any PFAS that goes down the drain flows to POTWs. Because of this, municipal biosolids, which consist of the solids that are separated and physically and chemically treated during the wastewater treatment process,[1] often contain trace levels of PFAS compounds. Handling the millions of tons of biosolids we generate[2] every year in a manner that is protective of human health and the environment is one of the most vital public services NACWA members provide to the communities they serve.

---

[1] "Biosolids" refers to treated wastewater residuals meeting the requirements of 40 C.F.R. Part 503.

[2] In their Complaint, Plaintiffs allege that the term "biosolids" is "euphemistically" used to refer to "sewage sludge." While NACWA disagrees with this characterization of the term "biosolids," NACWA notes that wastewater professionals use terms such as "generate" in this context euphemistically to refer to the aforementioned adage: everybody poops. We are all "generators" of PFAS-containing biosolids.

Municipal biosolids are regulated under CWA Section 405(d) and detailed EPA rules found at 40 C.F.R. Part 503. The Part 503 regulations establish acceptable biosolids management practices and limits on pollutants that may be present in biosolids "in concentrations which may adversely affect public health or the environment." 33 U.S.C. § 1345(d). The CWA requires EPA to review these regulations every two years "for the purpose of identifying additional toxic pollutants and promulgating regulations for such pollutants." 33 U.S.C. § 1345(d)(2)(C). In compliance with this mandate, EPA most recently published its Biosolids Biennial Report No. 9 in December 2022, which identified 13 new pollutants, including 3 PFAS chemicals, warranting further study. EPA is nearing completion of scientific risk assessments which will be used to determine whether additional regulation is necessary under Part 503 for two PFAS – perfluorooctanoic acid ("PFOA") and perfluorooctane sulfonate ("PFOS").[3]

It is critical to NACWA's members that their voices, as well as the voices of the scientific community, be heard during every phase of EPA's process in determining how to address PFAS in wastewater and biosolids. While the sanitary systems run by NACWA's members apply some of the most advanced wastewater treatment technology available, only three primary management options exist for handling the millions of tons of biosolids generated throughout the country every year: incineration, surface disposal (primarily through solid waste or sludge-only landfilling), and beneficial reuse via land application. EPA regulates all three options under its Part 503 regulations, and any changes to those regulations could require NACWA's members to overhaul their current approach to one of the most critical and central sanitation services they are responsible for

---

[3] EPA also recently developed a new Standardized Framework for Sewage Sludge Chemical Risk Assessment and Biosolids Screening Tool which the Agency intends to utilize to screen pollutants – not just PFAS – found in biosolids and determine whether a formal risk assessment for a given pollutant is warranted.

providing to their communities.  Critically, any regulations that restrict or eliminate one or more of the available biosolids management options will have significant adverse impacts on the options remaining, as well as on NACWA's members.  Therefore, decisions concerning whether and how to regulate particular PFAS compounds in biosolids must be made by expert regulators, considering all of the potential impacts – both direct and indirect – on the waste management cycle and following evidence-based science and informed policy considerations.

Without so much as a mention of EPA's ongoing assessments of PFOA and PFOS in biosolids, however, Plaintiffs now seek to forego the Agency's longstanding Part 503 risk assessment and regulatory processes and use this Court to compel EPA to take regulatory action on 29 individual PFAS in biosolids before EPA determines the need for such action.  Specifically, Plaintiffs seek the inclusion of 18 PFAS in EPA's Biosolids Biennial Report No. 9 (Table 1 PFAS) and promulgation of regulations for 11 PFAS identified in previous Biennial Reports (Table 2 PFAS).[4]  Rather than rashly charging ahead as Plaintiffs seek, EPA must use the Part 503 process to determine whether specific chemicals in biosolids pose a risk, as the presence of a chemical does not necessarily mean that its occurrence presents a risk or warrants regulatory action.  For example, EPA must consider complexities in determining the levels of PFAS uptake in soil and transport into agricultural products.  Identifying relative risk in light of the many sources of potential PFAS exposure unrelated to biosolids will likewise be a challenge, among many others.

Unsubstantiated regulation of PFAS in biosolids of the type sought by Plaintiffs would unduly restrict the already limited biosolids management options available to municipal clean

---

[4] The Complaint lists the 18 PFAS EPA allegedly failed to identify under Table 1 and the 11 PFAS EPA has allegedly failed to regulate under Table 2.  Second Am. Compl. ¶¶ 10–11, ECF No. 12.

water agencies at the expense of vital human health and environmental protections.  For example, land application of biosolids to farmland as a non-synthetic, affordable, and beneficial fertilizer is the most common form of biosolids management that has been used by many of America's largest cities for decades.  EPA notes on its website that such beneficial land application provides "a number of benefits including nutrient addition, improved soil structure, and water reuse," and "can have economic and waste management benefits (e.g., conservation of landfill space; reduced demand on non-renewable resources like phosphorus; and a reduced demand for synthetic fertilizers)."[5]

The relief sought by Plaintiffs, however, would mandate that EPA make a premature determination that multiple PFAS "are present in sewage sludge in concentrations which may adversely affect public health or the environment."  Such a determination would place NACWA members' ongoing use of sustainable land application as a proven, longstanding, environmentally beneficial means of biosolids management in jeopardy and unnecessarily increase public fears to the significant detriment of municipalities, the public they serve, and the agricultural community.

NACWA's members have and will continue to play a key public stewardship role in addressing the challenges posed by PFAS.  Adoption by EPA and states of practical, science-based approaches to PFAS regulation in biosolids is critical to NACWA members' continuing safe and efficient management of the enormous quantities of biosolids generated every day.  To that end, NACWA and its members have been in a steady dialogue with EPA for years regarding PFAS in wastewater and biosolids and have supported and participated in EPA's current PFAS risk

---

[5] EPA, *Basic Information about Biosolids*, https://www.epa.gov/biosolids/basic-information-about-biosolids (last visited Sept. 18, 2024).

assessments, which may ultimately result in changes to how biosolids are regulated under Part 503.

For example, EPA sought public nominations[6] of scientific experts to sit on an ad hoc panel to review its white paper, *A Standardized Approach to Biosolids Chemical Risk Assessment,* as well as its Biosolids Screening Tool and User Guide.  This group of experts, known as the Biosolids Panel, served under the auspices of EPA's Science Advisory Committee ("SAB"), a Federal Advisory Committee, and provided advice on EPA's updated approach to understanding pollutants that may be found in biosolids.  Comprised of fourteen individual experts, all with a great deal of scientific knowledge of chemistry, environmental and agricultural science, and risk assessment, the Biosolids Panel met publicly three times and produced a report containing revisions, suggestions, and considerations to the SAB.  NACWA attended these public meetings and submitted formal comments to the SAB.  Ultimately, the SAB "commended the EPA" for its "high level of work and responsiveness to a broad array of community concerns" and found that the updated risk assessment framework "reflect[s] current biosolids management[] including common, beneficial uses in agriculture."[7]  EPA has since used its new framework to understand the specific risks associated with PFOA and PFOS in biosolids in what is known as a refined risk assessment. This process has been fully vetted and supported by the SAB.

EPA is continuing to assess PFAS in biosolids through its POTW Influent PFAS Study, through which NACWA members will analyze wastewater samples in an attempt to identify PFAS

---

[6] *Request for Nominations to the Scientific Advisory Board Biosolids Chemical Risk Assessment Panel*, 86 Fed. Reg. 49,021 (Sept. 1, 2021), https://www.govinfo.gov/content/pkg/FR-2021-09-01/pdf/2021-18807.pdf.
[7] EPA, *Approach to Biosolids Chemical Risk Assessment and Biosolids Tool*, https://sab.epa.gov/ords/sab/r/sab_apex/sab100/advisoryactivitydetail?p18_id=2610&clear=18&session=14907119873596 (last visited Sept. 24, 2024).

sources and analyze their biosolids for PFAS and other chemicals.[8]   EPA is also supporting additional research efforts to evaluate PFAS concentrations in biosolids.   These scientific findings must inform any Agency decisions concerning regulation of PFAS in biosolids, including the threshold question of whether there is a need for such national regulation.

Plaintiffs, nevertheless, seek to upend EPA's established process for identifying and conducting risk assessments for pollutants in biosolids.  Rather, Plaintiffs ask this Court to compel EPA to forgo careful and comprehensive consideration of the evolving science for PFAS and critical public stakeholder input, and to instead categorically adopt Plaintiffs' own conclusions about the alleged harm posed by certain PFAS in biosolids and the actions the Agency must take in response.

NACWA meets the requirements of intervention as of right under Federal Rule of Civil Procedure 24(a)(2).  NACWA's members are directly responsible for managing the millions of tons of biosolids produced every year pursuant to EPA's biosolids regulations, and as such, they have a direct interest in any changes to those regulations and the determinations underlying them.  The available options for managing municipal biosolids and the costs of those options – both of which are critical considerations for NACWA's members and the communities they serve – could be affected by the outcome of this litigation.  Likewise, the ability of NACWA's members to utilize the biosolids management options that are most protective of human health and the environment, taking into account relevant local and regional conditions, could be placed in jeopardy.  As a representative of the municipal entities implementing biosolids regulations, NACWA's interests are distinct from those of EPA's – the federal agency tasked with developing and enforcing those

---

[8] EPA, *Study of PFAS Influent to POTWs* (Mar. 19, 2024), https://www.epa.gov/eg/study-pfas-influent-potws.

regulations.  NACWA's Motion is timely and does not negatively impact any party's interests, and should thus, be granted.  In the alternative, NACWA meets the requirements for permissive intervention under Rule 24(b)(1)(B) because NACWA's defenses are based on interpreting section 405 of the Clean Water Act and Section 706 of the APA and rely on facts common to both Plaintiffs and Defendant.  NACWA raises no new claims.

**STATEMENT OF FACTS**

Biosolids are byproducts of a wastewater treatment process in which a POTW separates liquids from solids and then treats the solid or semi-solid products to reduce bacteria and pathogens to safe levels.  Biosolids are managed in three primary ways: land application, landfilling, and incineration.  These methods of management have been vetted through decades of scientific study and are governed by the Part 503 rules as well as state regulations and local ordinances.  Managing biosolids in a manner protective of human health and the environment is one of the most critical public services clean water agencies provide to the communities they serve.  Due to the limited number of biosolids management options, actions impacting the availability of any one form of management will necessarily have cascading effects on the capacity of and costs associated with the other two in light of the sheer and unrelenting volume of biosolids generated in this country daily.

Utilities manage nearly 60% of biosolids through land application, a sustainable practice that benefits both the environment and farmers.[9]  Land application provides critical nutrients for crops, including nitrogen, phosphorus, and potassium, and many micronutrients.  The bulk properties of biosolids improve soil structure, restore vitality to degraded lands (such as those

---

[9] EPA, *Basic Information about Biosolids* (Dec. 15, 2023), https://www.epa.gov/biosolids/basic-information-about-biosolids.

impacted by fire or mining), and sequester carbon.[10]  Land application of municipal biosolids also reduces reliance on synthetic chemical fertilizers and pesticides.  Municipal biosolids can also provide a more affordable option compared to commercial fertilizers, particularly for small and part-time farmers.  Applying biosolids on land for agricultural purposes also plays a major role in reducing greenhouse gas emissions, which is a national policy goal in the United States and for many individual states.

In addition to land application, municipalities can also landfill biosolids in a monofill (a landfill that only accepts biosolids) under the CWA Part 503 regulations or co-dispose them in a municipal solid waste landfill under 40 C.F.R. Part 258.  To landfill biosolids, they must either be dried to reduce moisture content, which is energy- and cost-intensive, or bulky materials must be added to stabilize them, which increases their volume.  Importantly, landfill capacity in certain areas of the country is already extremely limited, and in some regions, existing landfills – which are often located in disadvantaged communities – are near capacity (e.g., Massachusetts is currently at 87% capacity).[11]  Preserving biosolids management options in addition to landfilling is therefore very important to clean water utilities.

Finally, clean water agencies can manage biosolids through incineration in sewage sludge incinerators.  While incinerators are still utilized in certain regions of the country, stringent Clean Air Act standards have resulted in an overall decrease in incinerator capacity over the last 15

---

[10] *See generally id.*; NACWA, Biosolids and PFAS: Maintaining Management Options 4 (June 2022) (attached hereto as Exhibit A).
[11] Massachusetts Department of Environmental Protection, *2022 Solid Waste Data Update* (Nov. 2023), https://www.mass.gov/doc/2022-solid-waste-data-update/download; EPA, *Municipal Solid Waste Landfills Economic Impact Analysis for the Proposed New Subpart to the New Source Performance Standards* (June 2014), https://www3.epa.gov/ttnecas1/docs/eia_ip/solid-waste_eia_nsps_proposal_07-2014.pdf; Exhibit A, at 4-5.

years.[12]  And for much of the country, siting and permitting challenges have kept utilities from bringing new incinerators online, precluding their use for significant biosolids management operations.  The Part 503 rules apply to POTWs, land appliers, surface disposal sites, sewage sludge incinerators, and other users or disposers of biosolids.  The rules impose pollutant limits, management practices, and operational standards for land application, landfilling, and incineration of biosolids.  Part 503 requirements are incorporated into and enforced through the National Pollutant Discharge Elimination System ("NPDES") permits of biosolids generators, including clean water agencies.

PFAS are a class of synthetic chemicals manufactured since the 1940s for use in many consumer products and industrial applications due to their water and heat repelling and other properties.  Because of their durability, trace amounts of PFAS can be found throughout the world ecosystem, including the human body.  PFAS enter wastewater treatment systems through upstream domestic (i.e., household), industrial, and commercial sources, including household products like PFAS-treated clothing, upholstery, and carpets, resulting in PFAS going down the drain and into the sewer system.  Even with reduction in the use of certain PFAS in products, legacy products will continue to contribute PFAS to sewer systems for the foreseeable future, and discarded materials in landfills can add PFAS to leachate that is treated by POTWs.  Public utilities are not designed to treat, remove, or destroy PFAS and have no readily available treatment options for the trace amounts of PFAS in the many millions of gallons of wastewater treated daily at a typical POTW.

---

[12] *See* 42 U.S.C. § 7429; 40 C.F.R. Part 60 Subparts O, LLLL, MMMM; 40 C.F.R. Part 62 Subpart LLL.

The Clean Water Act provides the level of treatment that POTWs must achieve.  This statutorily-mandated treatment consists of two levels: primary and secondary treatment.  Primary wastewater treatment physically separates solids from liquids, and secondary treatment uses beneficial microbes to remove remaining soluble organic material.  Neither of these processes are designed to treat or remove PFAS.[13]

The CWA requires EPA to identify toxic pollutants that "may be present in sewage sludge in concentrations which may adversely affect public health or the environment" and promulgate regulations establishing acceptable management practices and numeric limitations for such pollutants.  33 U.S.C. § 1345(d).  CWA Section 405(d)(2)(A) required EPA to identify these toxic pollutants "on the basis of available information on their toxicity, persistence, concentration, mobility, or potential for exposure" and promulgate regulations.  33 U.S.C. § 1345(d)(2)(A).  CWA Section 405(d)(2)(B) required EPA to identify toxic pollutants not identified under Section 405(d)(2)(A) and promulgate final regulations establishing management standards and numeric limitations.  33 U.S.C. § 1345(d)(2)(B).  EPA fulfilled these statutory requirements by promulgating the final rule Standards for the Use or Disposal of Sewage Sludge, 58 Fed. Reg. 9,248 (Feb. 19, 1993) (codified at 40 C.F.R. Part 503).  The CWA additionally requires EPA to review the biosolids regulations every two years "for the purpose of identifying additional toxic pollutants and promulgating regulations for such pollutants."  33 U.S.C. § 1345(d)(2)(C).

---

[13] In light of the challenges of treating PFAS at the POTW, NACWA's members have consistently advocated for EPA to undertake enhanced source control efforts, non-essential product elimination, and safer alternatives to mitigate the PFAS coming into sewer systems.  *See* EPA, PFAS Treatment in Drinking Water and Wastewater – State of the Science (Nov. 7, 2023), https://www.epa.gov/research-states/pfas-treatment-drinking-water-and-wastewater-state-science#:~:text=It%20is%20currently%20known%20that,and%20high%2Dpressure%20membrane%20systems. ("It is currently known that three treatment processes can be effective for PFAS removal: granular activated carbon, ion exchange resins, and high-pressure membrane systems.").

In compliance with the CWA, EPA published its Biosolids Biennial Report No. 9 for the reporting period 2020–2021 in December 2022. EPA identified 13 new pollutants warranting further study, including 3 PFAS, based on its consideration of the available data. EPA is currently conducting a risk assessment on two PFAS, PFOA and PFOS, to determine whether they may harm human health or the environment.[14] The risk assessment for PFOA and PFOS as identified in EPA's Strategic Roadmap will serve as the basis for determining whether regulation of these two PFAS chemicals in biosolids under Part 503 is appropriate.

In developing potential regulations for PFAS, EPA must incorporate public input through both informal meetings with stakeholder groups and formal evaluation through notice and comment rule making. *See* 33 U.S.C. § 1345(d)(1) (requiring EPA to consult with "other interested persons" prior to developing and publishing biosolids regulations). This will necessarily include consideration of the limited biosolids management options available to municipalities, including the environmental and human health benefits and risks associated with each, and the negative consequences that could result from removing any one from consideration.

The present lawsuit bluntly seeks to circumvent EPA's procedures and have the Court order EPA to regulate certain PFAS in biosolids before EPA has had the chance to assess whether such regulation is warranted. Plaintiffs' requested relief countermands CWA Section 405(d), which requires that EPA find an adverse effect to public health or the environment prior to regulation, and could arbitrarily limit NACWA members' options for managing biosolids in a manner protective of human health and the environment. Imposition of additional regulations could also impose increased sampling costs and treatment requirements on NACWA's members.

---

[14] EPA, *PFAS Strategic Roadmap: EPA's Commitments to Action* 2021–2024 at 16 (2021), https://www.epa.gov/system/files/documents/2021-10/pfas-roadmap_final-508.pdf.

Intervention is necessary for NACWA to protect the interests of its membership.  At stake is the ability of clean water agencies to provide one of the most fundamental human health and environmental services in modern society – the safe and reliable around-the-clock management of the billions of gallons of municipal wastewater and millions of tons of biosolids produced by the American public every year.

## ARGUMENT

NACWA plainly qualifies for intervention under well-established federal law.  Rule 24 provides two avenues for a party to intervene in a federal lawsuit.  *First*, NACWA is entitled to intervene as a matter of right pursuant to Rule 24(a).  *Second*, in the alternative, NACWA may be granted permissive intervention pursuant to Rule 24(b).  In this case, NACWA is entitled to intervene as a matter of right under Rule 24(a) because Plaintiffs' attempt to circumvent EPA's statutorily prescribed regulatory processes puts at risk NACWA members' ability to protect human health and the environment through effective biosolids management.  *See infra* Section I.A. Alternatively, NACWA should be permitted to intervene under Rule 24(b) because it shares issues of common law and fact with the defenses likely to be put forth by EPA.  *See infra* Section I.B. Finally, NACWA's participation in this suit is consistent with Article III's standing requirement. *See infra* Section I.C.

## I.    NACWA MAY INTERVENE AS OF RIGHT IN THIS LITIGATION.

NACWA easily satisfies all four requirements to intervene as of right: (1) the motion is timely; (2) NACWA claims a legally protected interest; (3) this action, as a practical matter, impairs or impedes NACWA's interest; and (4) NACWA's interest is not adequately represented by existing parties in this action.  *Crossroads Grassroots Pol'y Strategies v. Fed. Election Comm'n*, 788 F.3d 312, 320 (D.C. Cir. 2015) (intervention granted where suit challenging agency action involved

potential direct regulation of intervenor-defendant); *Fund for Animals, Inc. v. Norton*, 322 F.3d 728, 731 (D.C. Cir. 2003).

This case is in its preliminary stages and NACWA's Motion does not prejudice any of the existing parties. Intervention is necessary to allow NACWA to protect its members' critical interest in how biosolids are regulated. NACWA has a vested interest in ensuring that biosolids regulation follows a science-based and analytical process that is informed by NACWA members' decades of experience with biosolids management. When EPA determines regulation is appropriate, the operational and economic interests of NACWA members are directly affected. NACWA, whose members would bear the costs – both practical and economic – of implementing any regulations that EPA is forced to promulgate as a result of Plaintiffs' action, is in a distinctly different position from EPA. As a government entity, EPA represents the general public and must balance a variety of stakeholder interests, not just the interests of municipal entities. In addition, EPA does not have the on-the-ground experience managing biosolids that NACWA's members do, nor will EPA share the costs associated with any potential changes to utility operations necessitated by the relief sought.

### A.     This Motion is Timely.

NACWA's intervention is timely, because it neither delays the case nor causes prejudice to any of the existing parties. *Roane v. Leonhart*, 741 F.3d 147, 151 (D.C. Cir. 2014) ("[T]he requirement of timeliness is aimed primarily at preventing potential intervenors from unduly disrupting litigation, to the unfair detriment of the existing parties."). NACWA requests intervention within a reasonable time after Defendant's Motion to Dismiss, which was filed on September 9, 2024 and well in advance of any merits decisions. *See Waterkeeper All., Inc. v. Wheeler*, 330 F.R.D. 1, 6 (D.D.C. 2018) (granting motions to intervene filed before the Court had occasion to make any merits decisions). NACWA's Motion is filed for the purpose of defending

EPA's process for regulating biosolids and ensuring that NACWA's members are afforded an opportunity to participate in the formulation of any new regulations of PFAS in biosolids, which would likely significantly impair the interests of NACWA's members.  *Id.*  (timeliness analysis includes weighing the need for intervention as a means of preserving movant's rights).

B.      **NACWA Has a Substantial Interest in this Litigation.**

Through their complaint, Plaintiffs attempt to substitute their own judgment concerning the relative risks of PFAS in biosolids and appropriate response to those risks for that of EPA. While Plaintiffs claims are directed toward EPA, any changes to biosolids regulations would necessarily be implemented by NACWA members.  In this Circuit, a movant that demonstrates a "legally protected interest" has a right to intervention.  *Karsner v. Lothian*, 532 F.3d 876, 885 (D.C. Cir. 2008) (one of the prerequisites to intervene as of right is a legally protected interest in the action).  The test for a legally protected interest "operates in large part as a practical guide, with the aim of disposing of disputes with as many concerned parties as may be compatible with efficiency and due process." *Wildearth Guardians v. Salazar*, 272 F.R.D. 4, 12–13, 15–16 (D.D.C. 2010) (internal citation and quotes omitted) (mining trade association had interest in challenge to federal agency decision authorizing coal mining leasing).  NACWA's members have distinct interests: (1) ensuring that the statutory process for regulating biosolids is followed, which provides NACWA's members opportunities to be heard and establishes a rigorous scientific process to support regulatory decision-making; and (2) managing the potential public health and environmental consequences of any changes in the regulatory landscape for biosolids.

*First*, NACWA members have a vested interest in ensuring that the regulatory process at the heart of this litigation is not cut short.  The relief that Plaintiffs demand – an order from this Court that would require EPA to regulate the Table 2 PFAS and take additional steps towards regulating the Table 1 PFAS – would upend the statutorily-prescribed, ongoing processes for

development of biosolids regulations and strip EPA of the power to determine whether those substances should be regulated in the first place.  In addition to conducting its own analyses, EPA generally offers the public multiple forums of participation throughout the regulatory timeline to provide stakeholder input.  EPA hosts meetings and workshops, publishes materials for feedback, and engages in formal notice and comment procedures – all crucial avenues for public engagement.  NACWA has participated in these types of opportunities for public participation.  Krantz Decl. ¶ 16, Exhibit B.  With respect to PFAS regulation, NACWA has an interest in presenting its assessment of both the available science and technically and economically feasible management options based on the long experience of its members with biosolids management.

Plaintiffs' requested relief circumvents the regulatory process, depriving NACWA members of opportunities to present information to EPA in the normal course.  NACWA must participate in this lawsuit because its advocacy could help uphold EPA's process or otherwise shape the important issues concerning how PFAS will be regulated.  *See, e.g., Wheeler*, 330 F.R.D. at 7 (movant utility owners and operators had interests in lawsuit challenging state regulatory program authorizing the disposal of coal residuals); *W. Org. of Res. Councils v. Jewell*, No. CV 14-1993 (RBW), 2015 WL 13711094, at *4 (D.D.C. July 15, 2015) (mining association had interest in ensuring the federal coal management program "remains uninterrupted" to protect mining investments and operations); *Env't Def. Fund v. Thomas*, No. CV 85-1747, 1985 WL 6050, at *5 (D.D.C. Oct. 12, 1985) (decisions regarding the process of promulgating regulations may affect their content, giving rise to cognizable interests in those individuals governed by the regulations).

*Second*, if Plaintiffs' requested relief is granted, NACWA's members will have to directly bear the impacts that relief has on the availability of biosolids management options, as well as any associated sampling and treatment costs.  Wastewater utilities safely manage biosolids through

16

methods authorized by Part 503 – land application, landfilling, or incineration – subject to restrictions and standards based on limits for identified toxic pollutants. The regulation of any new substance (let alone multiple substances) under Part 503 will change NACWA members' management of biosolids. Imposing pollutant limits for PFAS under Part 503 will alter NACWA members' existing disposal options, entail sampling and monitoring costs, and potentially require costly operational changes. *See* Ex. A, at 6-7. PFAS restrictions imposed on land appliers and landfills may also impact the contracts NACWA members have with third parties to dispose biosolids through these means. *Id.* at 6. These sorts of investments,[15] costs, and economic losses satisfy Rule 24(a)(2)'s interest requirement. *Ctr. for Biological Diversity v. U.S. Dep't of the Interior*, 640 F. Supp. 3d 59, 68 (D.D.C. 2022) (granting intervention to movants in suit challenging agency approval of permits to drill due to movants' financial and property interests in the permits).[16]

### C.   The Disposition of this Litigation May Impair or Impede NACWA's Ability to Protect its Interests.

The outcome of this case could ultimately result in huge costs for NACWA members and their communities, readily satisfying this requirement for intervention. A lawsuit has the practical consequence of impairing prospective intervenors' interests when the "disposition of the action would result in a substantial change in the status quo with respect to those interests, such that the

---

[15] Importantly, if EPA's regulatory process ultimately determines through a scientifically-sound evaluation that pollutant limits for PFAS in biosolids are necessary, NACWA's members will work vigorously and invest to comply with them. But Plaintiffs seek to short-circuit that process and require compliance with standards they – not EPA – deem necessary at this time.

[16] *See also Nat'l Parks Conservation Ass'n v. U.S. E.P.A.*, 759 F.3d 969, 976 (8th Cir. 2014) ("When a third party files suit to compel governmental agency action that would directly harm a regulated company, the company's economic interests in the lawsuit satisfy Rule 24(a)(2)'s recognized-interest requirement."); *Kleissler v. U.S. Forest Serv.*, 157 F.3d 964, 972 (3d Cir. 1998) (timber companies had direct and substantial interests in a lawsuit aimed at halting logging or reducing the efficiency of timber-cutting methods).

task of reestablishing the status quo if [plaintiffs] succeed [ ] . . . will be difficult and burdensome."

*Wheeler*, 330 F.R.D. at 7 (quoting *District of Columbia v. Potomac Elec. Power Co.*, 826 F. Supp.

2d 227, 234 (D.D.C. 2011)) (internal quotes omitted).  This requirement looks to the "practical

consequences of denying intervention, even where the possibility of future challenge to the

regulation remain[s] available."  *Norton*, 322 F.3d at 735.  Thus, even where NACWA has the

ability to challenge a future EPA action regulating PFAS, this does not preclude intervention at

this early stage.

Plaintiffs' demanded relief – the unsubstantiated regulation of multiple PFAS under Part

503 – may further restrict already limited options for disposal of biosolids, most importantly, the

land application of biosolids, thereby leading to significant human health and environmental

challenges.   Incineration and landfilling are already less common methods of biosolids

management.[17]  Incineration is subject to strict air emission requirements, and the construction and

permitting of incineration facilities can be prohibitively expensive.[18]  Landfill capacity is likewise

limited, and landfills often restrict the volume of biosolids they will receive because of odors and

operational challenges caused by semi-liquid material.[19]  Landfilling can also necessitate greater

transportation distances, leading to increased costs and air emissions.  *Id.*; Exhibit A, at 5.  Due to

these limitations and the goal of beneficial use of biosolids through recycling, the large majority

of biosolids are land applied, and have been since the advent of modern, advanced wastewater

treatment in the 1970s.[20]

---

[17] EPA, *Basic Information about Biosolids*.

[18] EPA, *Biosolids Technology Fact Sheet Use of Incineration for Biosolids Management* (June 2003), https://www.epa.gov/sites/default/files/2018-11/documents/use-incineration-biosolids-management-factsheet.pdf.

[19] *Id.*

[20] EPA, *Basic Information about Biosolids*.

Nor is existing waste infrastructure equipped to effectively remove or reduce PFAS. Conventional waste treatment systems were not designed to do so. Technology to treat large volumes of wastewater for minute traces of PFAS is currently unavailable. Even assuming such technology becomes available, PFAS restrictions under Part 503 could require NACWA members to replace existing wastewater treatment technologies with technologies at exorbitant costs that would necessarily be passed on to the communities they serve, including low-income and environmental justice communities that are already struggling with the cost of clean water services.

Alarmingly, PFAS restrictions on the key method to managing biosolids could prohibit land application altogether. These are not mere possibilities. In response to public concern generally about PFAS, Maine, for example, passed legislation banning the land application of municipal biosolids in April 2022.[21] Utilities have been forced to transport waste residuals to landfills, or even to Canada at very high costs. *See* Ex. A, at 5. The worst-case scenario is that wastewater utilities would be left with nowhere for sewage sludge to go – creating a public health and environmental crisis. If EPA were ordered to impose PFAS restrictions in biosolids across the country, NACWA members would no doubt experience substantial changes to the status quo that would be burdensome, if not impossible, to re-establish.[22]

If successful, Plaintiffs' lawsuit would require EPA to regulate *at least* 11 PFAS under its Part 503 regulations. EPA would also be required to identify 18 PFAS in its next Biennial Report. By Plaintiffs' logic, once the 18 PFAS are identified in a Biennial Report, these PFAS would

---

[21] L.D. 1911, An Act to Prohibit the Contamination of Clean Soils with So-called Forever Chemicals (Apr. 1, 2022), https://www.mainelegislature.org/legis/bills/getPDF.asp?paper=HP1417&item=2&snum=130.

[22] Other states, including Michigan and Maryland, have taken more informed approaches that have avoided the potentially catastrophic results of the type NACWA's members are concerned about.

require regulation under Part 503 as well.  EPA could therefore be forced to prematurely take action on 29 PFAS for which the risks to human health and the environment are not established.  As a result, all three management methods of biosolids – land application, incineration, and landfilling – may be unduly restricted.  And any new limitation on the management methods would exacerbate the existing challenges described above.

Even if NACWA vindicated its interests later through rulemaking participation or by bringing a separate lawsuit, the task would be "difficult and burdensome."  *Fed. Election Comm'n*, 788 F.3d at 320 (quoting *Norton*, 322 F.3d at 735).  Any injury suffered during the interim period would be substantial and likely irreparable.  *Id.*  Plaintiffs' lawsuit calls for EPA determinations about the potential harms of PFAS *now*, which warrants NACWA's intervention.

### D.  EPA Cannot Adequately Represent NACWA's Interest.

NACWA also meets the criteria for inadequacy of representation in the litigation by the defendant federal regulator.  An intervenor meets this requirement "if the applicant shows that representation of [its] interest 'may be' inadequate; and the burden of making that showing should be treated as minimal."  *Norton*, 322 F.3d at 735 (quoting *Trbovich v. United Mine Workers*, 404 U.S. 528, 538 n.10 (1972)).  This requirement is "not onerous."  *Dimond v. District of Columbia*, 792 F.2d 179, 192 (D.C. Cir. 1986).

EPA represents the interests of the United States, while NACWA's concerns are for the specific needs of its public member agencies who are on the front lines of managing biosolids in their communities every day.  The D.C. Circuit has "often concluded that governmental entities do not adequately represent the interests of aspiring intervenors."  *Norton*, 322 F.3d at 736 (citing cases).  EPA's decision-making may reflect the interests of many diverse parties at large, while NACWA represents the specific interests of its members who are public wastewater utilities.  *Norton*, 322 F.3d at 737 (federal government did not adequately represent the "narrow and

20

parochial" interests of a Mongolian government entity); *Hardin v. Jackson*, 600 F. Supp. 2d 13, 16 (D.D.C. 2009) (EPA did not adequately represent economic and proprietary interests of pesticide manufacturer).  NACWA, unlike EPA, represents member agencies who conduct the day-to-day operations of providing wastewater treatment services and managing biosolids.  *Fowler v. U.S. EPA.*, No. CV 09-005 CKK, 2009 WL 8634683, at *4 (D.D.C. Sept. 29, 2009) (EPA did not adequately represent "economic and operational concerns" of water utility membership organizations).

As a representative of the regulated community, NACWA's interests are distinct from EPA's.  "[M]erely because parties share a general interest in the legality of a program or regulation does not mean their particular interests coincide so that representation by the agency alone is justified." *Am. Horse Prot. Ass'n v. Veneman*, 200 F.R.D. 153, 159 (D.D.C. 2001) (finding USDA could not adequately represent horse advocacy group in suit challenging legality of horse training practice).  While NACWA supports the legal process EPA takes to identify and evaluate potential toxic pollutants in biosolids, NACWA may have different views of the science, the risks, and the practical constraints of managing biosolids that inform how EPA should regulate biosolids. NACWA counts on participating in EPA's forums for commenting and participation to bring its unique perspective to the Agency.

## II.    ALTERNATIVELY, THE COURT SHOULD GRANT NACWA PERMISSIVE INTERVENTION.

NACWA also satisfies permissive intervention criteria.  NACWA has claims or defenses that share common questions of law or fact with the main action, meeting the requirements of Rule 24(b)(1)(B). Rule 24(b) "provides basically that anyone may be permitted to intervene if his claim [or defense] and the main action have a common question of law or fact."  *Nuesse v. Camp*, 385 F.2d 694, 704 (D.C. Cir. 1967); *see also EEOC. v. Nat'l Children's Ctr., Inc.*, 146 F.3d 1042, 1045–

46 (D.C. Cir. 1998) (Rule 24(b)'s "claim or defense" requirement has the goal of disposing related controversies together). The Court also "must consider whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights." *Black v. LaHood*, No. CV 11-1928 (JEB), 2012 WL 13054502, at *1 (D.D.C. Apr. 30, 2012) (quoting Fed. R. Civ. P. 24(b)(3)) (granting permissive intervention to non-profit organizations who had similar defenses to the Department of Transportation's positions).

As described above, NACWA's Motion is timely and will not unduly delay or prejudice the existing parties in this litigation. NACWA's claims or defenses share a common question of law or fact with the main action. The questions arise from EPA's statutory duties under CWA Section 405(d) to identify and regulate pollutants and whether EPA's actions taken in the Biennial Report are sufficient to meet the statute's requirements. Like EPA, NACWA seeks to uphold the rightful procedural requirements to developing Part 503 regulations. *See Ass'n of O&C Counties. v. Trump*, No. CV 17-280, 2018 WL 11241964, at *1 (D.D.C. Jan. 22, 2018) (granting permissive intervention to non-profit organizations who shared similar defenses with defendant federal government's Monument designation).

### III.  NACWA IS NOT REQUIRED TO DEMONSTRATE ARTICLE III STANDING, BUT IF REQUIRED, CAN DEMONSTRATE REPRESENTATIONAL STANDING.

If this Court determines an intervenor requires Article III standing, NACWA is a trade association entitled to intervene on behalf of its members.[23]  *See Fund Democracy, LLC v. SEC.*,

---

[23] NACWA is not required to demonstrate Article III standing. A party seeking to intervene but not invoking a court's jurisdiction or seeking additional relief does not need to demonstrate independent Article III standing. *See Env't Integrity Project v. Wheeler*, No. 20-cv-1734 (KBJ), 2021 WL 6844257, at *2 (D.D.C. Jan. 27, 2021) (Brown Jackson, J.) (granting trade groups' motion to intervene, provided that movants were seeking to intervene as defendants and not invoking the court's jurisdiction) (citing *Va. House of Delegates v. Bethune-Hill*, 139 S. Ct. 1945, 1951 (2019)); *see also Town of Chester v. Laroe Estates, Inc.*, 581 U.S. 433, 440 (2017)

278 F.3d 21, 25 (D.C. Cir. 2002) ("An association only has standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests it seeks to protect are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members . . . ."). The issues in this case directly impact NACWA's members, who will individually bear the consequences resulting from the granting of Plaintiffs' relief. Neither Plaintiffs' claims nor the requested relief – both of which exclusively involve EPA action – require members to participate in their individual capacities. A finding of representational standing on behalf of NACWA is appropriate.

**CONCLUSION**

Plaintiffs challenge EPA's regulation of one of the most basic environmental services provided by NACWA's members: the management of biosolids from the wastewater treatment process generated by over 330 million Americans. NACWA's members are the entities responsible for performing this function in a manner protective of human health and the environment and should participate in this lawsuit.

Based on the above, NACWA meets the requirements for intervention as of right pursuant to Fed. R. Civ. P. 24(a)(2) or in the alternative, permissive intervention pursuant to Fed. R. Civ. P. 24(b)(1). In addition, NACWA submits the attached Motion to Join Defendants' Motion to Dismiss Plaintiffs' Second Amended Complaint to be filed if NACWA's Motion to Intervene is granted. NACWA will serve a responsive pleading, if necessary, in accordance with Rule 12(a)(4).[24]

---

(observing Article III standing is required when a movant is seeking relief different from relief sought by a plaintiff with standing).

[24] *Accord 6 Moore's Federal Practice - Civil § 24.20* ("[A] court may approve an intervention motion that is not accompanied by a pleading if the court is otherwise apprised of the grounds for the motion." (collecting cases)). Under the circumstances of this case, adjudication of the government's motion to dismiss before requiring any party – including NACWA – to answer

Dated: September 26, 2024

Respectfully submitted,

/s/ *James B. Slaughter*
BEVERIDGE & DIAMOND, P.C.
James B. Slaughter (D.C. Bar No. 417273)
jslaughter@bdlaw.com
1900 N Street NW, Suite 100
Washington, DC 20036
Phone: (202) 789-6000

Allyn L. Stern (*pro hac vice to be filed*)
astern@bdlaw.com
600 University Street, Suite 1601
Seattle, WA 98101-3109
Phone: (206) 315-4800

Thomas P. Kolkin (*pro hac vice to be filed*)
tkolkin@bdlaw.com
201 North Charles Street, Suite 2210
Baltimore, MD 21201
Phone: (410) 230-1300

*Counsel for National Association of Clean
Water Agencies*

NATIONAL ASSOCIATION OF CLEAN
WATER AGENCIES
Amanda Aspatore
AAspatore@nacwa.org
1130 Connecticut Ave NW, Suite 1050
Washington, DC 20036
Phone: (202) 833-2672

---

provides for the most efficient and orderly sequencing for the case in accordance with Fed. R. Civ. P. 1.

## <u>CERTIFICATE OF SERVICE</u>

      I hereby certify that on September 26, 2024, a true copy of the foregoing Memorandum in Support of the Proposed Intervenor-Defendant NACWA's Motion to Intervene was filed using the CM/ECF system and notice sent by the Court's electronic filing system to:


<u>/s/ *James B. Slaughter*</u>