# EXHIBIT B

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| JAMES FARMER, ROBIN ALESSI, PATSY SCHULTZ, KAREN COLEMAN, TONY COLEMAN, JOHNSON COUNTY, TEXAS, MAINE ORGANIC FARMERS AND GARDENERS ASSOCIATION, and POTOMAC RIVERKEEPER, INC., d/b/a POTOMAC RIVERKEEPER NETWORK<br><br>      Plaintiffs,<br><br>  v.<br><br>UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, and MICHAEL REGAN, in his official capacity as Administrator of the United States,<br><br>      Defendants<br><br>  and<br><br>NATIONAL ASSOCIATION OF CLEAN WATER AGENCIES<br><br>      Proposed Intervenor-Defendant. | Civil Action No. 24-cv-01654-DLF<br><br>Hon. Dabney L. Friedrich |

**DECLARATION OF ADAM KRANTZ IN SUPPORT OF PROPOSED INTERVENOR
DEFENDANT NATIONAL ASSOCIATION OF CLEAN WATER AGENCIES'
<u>MOTION TO INTERVENE</u>**

I, Adam Krantz, hereby declare and state as follows:

    1. I am the Chief Executive Officer of the National Association of Clean Water Agencies ("NACWA") and have held this position since 2015. I offer this declaration in support of NACWA's motion to intervene as a defendant in the above-captioned matter.

1

This declaration is based on my personal knowledge and on information made known to me in my role and responsibilities at NACWA.

2. Prior to my current position, I worked for 17 years in the clean water sector in various other capacities. At no time during my 25 years working with public clean water utilities has the sector been facing such significant challenges.

3. I have a B.A. from Columbia University and a Master of Arts from the University of Chicago.

4. I received my law degree from the American University's Washington College of Law.

5. NACWA is a voluntary, non-profit national trade association headquartered in Washington, D.C. NACWA's members include over 350 public water agencies that provide wastewater services and stormwater management to cities, towns, and communities throughout the United States. In the aggregate, NACWA's members provide services to a large majority of America's population served by sewers.

6. In my role as CEO of NACWA, I am familiar with the operations of publicly owned treatment works (POTWs), including the management and regulation of the byproducts produced when liquids are separated from solids during the wastewater treatment process, commonly referred to as "biosolids." Biosolids management constitutes a large part of the operations and costs of POTWs. I have devoted significant time to biosolids issues throughout my career at NACWA.

7. Wastewater utilities generate thousands of tons of biosolids every day as a necessary function of the nation's wastewater treatment processes. This huge volume of material must be moved and managed offsite.

8. NACWA members that manage biosolids have three options for disposal under the Clean Water Act—incineration, land application, and landfilling.

9. Land application is considered a beneficial use and biosolids that meet detailed EPA criteria under 40 C.F.R. Pt. 503 for treatment and management may be applied to agricultural sites that grow food and feed crops and pastureland. Biosolids that achieve the highest pathogen reduction and low levels of pollutants under Part 503 are bagged and sold or distributed as a fertilizer for home lawns and gardens. Biosolids are also a prime feedstock for compost products that are used as farm fertilizer and soil amendment.

10. It is estimated that more than half of U.S.-generated biosolids are beneficially land applied.  The remaining biosolids are either disposed of in landfills, as either monofill governed under Part 503 or, predominantly, in municipal solid waste landfills, and or incinerated in sewage sludge incinerators, also governed under Part 503. Co-disposal with municipal solid waste and incineration are both additionally regulated by 40 C.F.R. Part 258 and Section 129 of the Clean Air Act, respectively.

11. Land application of biosolids has occurred on a large scale nationwide since the advent of modern wastewater treatment in the 1960s and 1970s. The safety and benefits of land application have been validated through thousands of published studies, including two reviews by the National Academy of Sciences.

12. NACWA members do not use or manufacture per- and polyfluoroalkyl substances (PFAS).  Rather, they receive PFAS that has entered the wastewater collection system (sewers) from industrial, commercial, and household sources.

13. Currently, NACWA members' facilities have no viable treatment options for PFAS at the scale needed for the volume of water treated at POTWs. PFAS in wastewater

typically is found in the low parts per trillion level, and POTWs often treat over 100 million gallons of wastewater a day, making PFAS removal a daunting engineering, scientific, and logistical challenge. PFAS can therefore remain in biosolids even after going through wastewater treatment systems.

14. NACWA has been proactive in the national discussion of PFAS in wastewater and continuously surveys its members in order to provide a holistic voice on the matter.

15. NACWA participates in the stakeholder processes that inform EPA's regulations, which includes attending meetings and workshops and providing both informal and formal comments to EPA for consideration.

16. Were land application to be removed as a biosolids management option, clean water agencies could be forced to landfill biosolids. However, landfill capacity and availability are limited and expensive, particularly in more urban areas of the country. Landfills also face unique management issues with biosolids and often limit biosolids intake or prohibit biosolids as states work to divert organic materials from landfills to recycling practices, like land application. A land application ban could therefore trigger the increased transportation of heavy solids at great cost—which also creates additional nuisance and air quality concerns in communities that did not produce the biosolids.

17. Reliance on landfill disposal also jeopardizes landfill stability as increased disposal generates increased leachate—which in turn must be treated at a wastewater treatment facility—and requires updated landfill management practices.

18. The State of Maine passed legislation banning the land application of municipal biosolids in April 2022. As a result, biosolids must be transported great distances, primarily to Canada.

19. In Pima County, Arizona, a land application moratorium that lasted less than a year resulted in doubled biosolids management costs.

20. Similarly, if incineration—a disposal method that faces its own limitations concerning environmental and economic factors—is banned, facilities face the expensive and sometimes infeasible options to either build biosolids treatment equipment or locate nearby land for land application, the availability of which is not guaranteed.

21. EPA's decisions concerning the need to regulate PFAS in biosolids and if so to what extent will significantly impact NACWA members' interests. Specifically, members may lose or be forced to amend their existing contracts for disposal and biosolids infrastructure—both of which could result in significant financial hardship.  Worse still, NACWA members could face a public health and environmental crisis if they are left with no feasible alternatives for managing this unavoidable byproduct of our modern sanitation process.

22. Combined, the cost, lack of treatment technology, and limited disposal methods could result in an abundance of biosolids with no means of disposal, which will harm both NACWA members, the communities they serve, and American public health and infrastructure generally.

23. NACWA continuously surveys and listens to its members regarding looming PFAS issues and concerns and is uniquely situated to represent the view-points of the public wastewater sector as well as their many contractors and farm partners. Additionally, NACWA and its members may disagree with the methods, evidence, or standards implemented and utilized by EPA in its rulemaking process.

24. NACWA acknowledges that the management of PFAS poses a challenge in protecting public and environmental health, however state and local bans have illustrated the consequences of regulating PFAS and biosolids management practices without proper scientific, technical, and financial analysis and study. As such, NACWA has a vital interest in ensuring that EPA is provided the opportunity to identify and fully evaluate PFAS on its own schedule.

I declare under the penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge and belief.

Dated: September 23, 2024

Respectfully submitted,

*[signature]*

_____
Adam Krantz
